# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| RUSH UNIVERSITY MEDICAL CENTER, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 04 C 6878 |
| v. | ) ) | |
| MINNESOTA MINING AND MANUFACTURING COMPANY, | ) ) ) | Wayne R. Andersen |
| Defendant. | ) | District Judge |

## MEMORANDUM OPINION AND ORDER

This case is before the court on the motion in limine of plaintiff Rush University Medical Center ("Rush") to bar defendant from using opinion evidence relating to Rush's alleged "contributory deficiencies" and general financial condition as well as the motion in limine of defendant Minnesota Mining and Manufacturing Company ("3M") to exclude Rush's "lost cost savings" evidence and the testimony of Robert M. Hess. For the reasons set forth below, Rush's motion in limine is denied in part and granted in part and 3M's motion in limine is granted. Additionally, for the reasons stated in the pre-trial conference held in chambers on June 26, 2009, the court made the following rulings: 1) Rush's motion in limine to exclude evidence and/or argument to offset Rush's damages by the purported value to Rush of the Care Innovation System is granted; 2) Rush's motion in limine to bar 3M from argument based on Rush's renewals of the System Purchase Agreement and continued use of the Care Innovation System is denied; 3) 3M's motion in limine to exclude evidence or reference to other lawsuits or complaints about the Care Innovation system is denied as a whole, however, the court ruled that Rush should bring any specific evidence regarding other user's complaints to the court and 3M's

attention sufficiently in advance of trial so that a decision regarding each specific complaint can be made on a case-by-case basis.

This case is also before the court on 3M's motion for discovery sanctions. For the reasons set forth below, this motion is denied.

## BACKGROUND

In the spring of 1995, plaintiff Rush and defendant 3M began discussions regarding Rush's interest in 3M's Care Innovation system, an integrated clinical information system designed to give medical providers improved electronic access to patient records. On December 24, 1998, after nearly three years of negotiations, the parties signed a contract for Rush to license Care Innovation. Rush paid $3 million for the Care Innovation system under the Initial Agreement and the system went "live" at Rush by the fall of 1999.

The parties' contract required 3M's Care Innovation system to link Rush's different computerized clinical and administrative systems into a single, integrated patient data system—a "clinical data repository" ("CDR") — from which Rush's physicians, nurses, and others could obtain information on patients' medical histories and treatments. The contract also required 3M to provide a Care Innovation system with certain "functionalities" that would enable Rush's physicians, nurses, researchers, and administrators to interact with the clinical information in the CDR and provide "workflow" solutions to accommodate the way in which patient care was delivered at Rush. Rush alleges that during the negotiations leading up to the parties' agreement, 3M made certain representations to Rush that caused Rush to believe that 3M had the capabilities to provide all of Rush's requested functionalities.

One of the functionalities that was supposed to be provided by 3M is an Alert

Management System, which is comprised of several Alerts packages that, when activated, are supposed to provide valuable notifications to users. For example, the Alerts can generate notifications that a patient's recent lab test had come back abnormal ("Critical Lab Alerts") or that a prescribed drug may interact adversely with another prescribed drug ("Adverse Drug Events"). It is undisputed that 3M delivered Care Innovation to Rush with the Alert Management System and four Alerts packages.

On September 27, 2001, Rush sent a letter to 3M both praising Care Innovation's ease of use in delivering clinical information to Rush's clinicians and also raising specific issues with the system regarding the missing or inactive functionalities that 3M had promised to provide. On October 11, 2001, 3M sent a letter to Rush in which 3M assured Rush that 3M was committed to the development and long-term growth of its Care Innovation system. Rush contends that it relied on those representations and continued to believe that 3M would provide the key functionalities that 3M had promised to provide.

On February 21, 2002, 3M sent Rush and all of 3M's other Care Innovation customers a letter in which 3M made clear that it was no longer committed to developing certain components of Care Innovation. According to Rush, these components included certain functionalities that 3M had contracted to provide to Rush. Additionally, Rush's Clinical Alerts Study Working Group began testing the alerts and on April 29, 2002, the study group reported that the Alerts were defective. Rush noted some minor benefits with the Alerts but asserts that the Alerts' limitations made them unsuitable for deployment to its' physicians. As a result of these developments, Rush signed an agreement with another vendor to provide Rush with a system that would include the functionalities that 3M allegedly failed to provide. Rush continued to use

3M's Care Innovation system until the new system was put into place.

On October 26, 2004, Rush filed this lawsuit against 3M for breach of contract. Rush has requested over $31 million in damages, which includes Rush's alleged $9.5 million cost to replace Care Innovation as well as $22 million in "cost savings" that Rush claims 3M promised but that Rush did not realize.

This case is set for trial before this court on November 9, 2009. In preparation for trial, the court presided over a pre-trial conference on June 26, 2009, at which time Rush presented three motions in limine to the court and 3M presented two motions in limine to the court. The court ruled on three of the motions at the pre-trial conference and withheld judgment on two of the motions pending further review and briefing. We now turn to those motions.

## DISCUSSION

**I.    Rush's Motion in limine to Bar Evidence Regarding Contributory Deficiencies and Rush's Financial Condition**

Rush's motion in limine seeks to bar 3M from presenting evidence related to: 1) Rush's "contributory deficiencies" as described in the expert report of Dr. Richard Kremsdorf, and 2) Rush's financial condition during the time period relevant to this lawsuit. Dr. Kremsdorf's report discusses the fact that Rush had financial difficulties at certain times and concludes that because Rush spent below industry average on information technology, it likely had some responsibility for 3M's failures. Specifically, Dr. Kremsdorf cites to a June 24, 2005 presentation by Rush regarding technology implementation in which Rush stated that the need for Rush to have personnel support in the implementation of technology was a key lesson learned.

With respect to the contributory deficiencies evidence, Rush claims that because contributory negligence is not a defense to a breach of contract action and because 3M fails to cite to any specific act that Rush was supposed to do but failed to do, this testimony should be barred. However, given that Rush argues that the Alerts did not function properly, 3M has to be able to present, as a defense to that argument, evidence that it delivered functioning Alerts, and the reason they did not work is because Rush did not support the system as it should have. Additionally, 3M must be allowed to use Rush's own words (such as the technology presentation) as evidence supporting its argument. However, at trial the burden will be on 3M to show that, if Rush had supported the system, the system would have functioned properly. Accordingly, we deny Rush's motion in limine with respect to the contributory deficiencies evidence and the expert testimony of Dr. Kremsdorf.

With respect to the evidence regarding Rush's financial condition, we grant Rush's motion in limine. Although we find that 3M should be able to present evidence that Rush did not perform as it should have and that it may not have spent enough money in the area of information technology to provide the proper support for Care Innovation, the jury does not need to know whether or not Rush was under general financial stress at the time. This information is irrelevant to whether or not 3M breached the contract. Furthermore, courts often recognize that the issue of the finances of a party can distract the jury from the real issues in the case. *See, e.g.*, *Mountain Funding, Inc. v. Frontier Ins. Co.*, No. 01 C 2785, 2004 U.S. Dist. LEXIS 6915, at *7-9 (N.D. Ill. Apr. 22, 2004); *see also Brough v. Imperial Sterling, Ltd.*, 297 F.3d 1172, 1178-79 (11th Cir. 2002); *Whiteley v. OKC Corp.*, 719 F.3d 1051, 1055 (10th Cir. 1983).

5

**II.   3M's Motion in limine to Exclude Rush's "Lost Cost Savings" Evidence and Bar the Testimony of Robert M. Hess**

Rush's breach of contract action seeks a total of approximately $32 million in damages. (Rush recently adjusted this figure to approximately $37 million. See Section IV, *infra*.) Approximately $9.5 million (Rush recently adjusted this figure to approximately $14.7 million) of the claimed damages are the alleged costs to Rush to replace the Care Innovation system. Although 3M believes that Rush's $9.5 million replacement cost figure is flawed, it is not the subject of the instant motion in limine. Rather, this motion in limine seeks to bar evidence regarding Rush's $22 million damages claim for "lost cost savings," which is the amount that Rush claims it would have saved during the contract term if Rush has been able to use the promised functionality of the Care Innovation Alert Management System. 3M's motion seeks to bar two main components that make up Rush's evidence regarding lost cost savings: 1) the Alert Cost Savings letter and the analysis attached to that letter ("the Analysis"); and 2) the testimony of Rush's expert, Robert M. Hess, who relies primarily on the Analysis to form the basis for his opinion.

*A. The Letter and Analysis*

As stated above, negotiations between 3M and Rush for the purchase Care Innovation system began in 1995. In or about January 1996, 3M created an analysis of projected cost-savings figures by using the alerting functions of the Care Innovation system and sent it to Rush. It is undisputed that in order to prepare the Analysis, a 3M employee used a report prepared by Latter Day Saints Hospital ("LDS Hospital") in Salt Lake City, Utah. LDS hospital had prepared a report in the early 1990s that quantified cost savings at the hospital while using

6

alerting technology developed for HELP, an earlier system similar to Care Innovation, that was sold by 3M. In order to convert the LDS data to apply to Rush, 3M used publicly available data to account for differences between the two hospitals in case mix, patient days, and discharges. On January 24, 1996, 3M sent the Analysis to Dr. Brill at Rush along with a cover letter, which stated in relevant part, "I am enclosing the cost justification I talked to you about yesterday. Again, all Rush system hospitals are compared to LDS Hospital." (3M Memo., Exh. H.) As stated above, after further negotiations, 3M and Rush entered into an agreement in December 1998 for 3M to provide Care Innovation to Rush. The Letter and the Analysis prepared by 3M were not incorporated into the agreement between the parties. The Care Innovation system went "live" at Rush by the fall of 1999.

As described above, Rush asserts that there were several problems with the Care Innovation system. Specifically, Rush alleges that 3M failed to provide functional Alerts to Rush and that the Alerts were unsuitable for deployment to physicians. Rush further claims that the failure of the Alerts was one of the key reasons that Rush concluded that it needed a replacement system to deliver what it had expected 3M to deliver per the contract. Therefore, Rush asserts a claim for a approximately $22 million in damages based on cost savings that it claims Rush would have achieved if the Alerts had been functional and Rush had been able to use them. Rush's expert, Dr. Richard Hess, arrived at the $22 million figure by using the Analysis provided to it by 3M and adjusting the Analysis for inflation and the time period of the contract between Rush and 3M.

3M seeks to bar Rush's lost cost savings evidence and, therefore, its lost cost savings damages claim of approximately $22 million, on the grounds that the figure is far too speculative

to form the basis for a damages claim, the Analysis was prepared by someone at 3M, not someone with the requisite knowledge of Rush's business, and the Analysis was not included in the integrated agreement between the parties.

3M first asserts that the lost cost savings figure is speculative and has not been established with reasonable certainty, as required by Illinois law. Therefore, Rush claims that the evidence must be barred. (In applying the law, Rush analogizes lost cost savings with lost profits, which we find to be a fair analogy for the purposes of this motion). The Illinois Commercial Code states that a buyer's damages for breach with respect to accepted goods may include incidental and consequential damages, if appropriate. 810 ILCS 5/2-714. Consequential damages are defined as "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not be prevented by cover or otherwise," 810 ILCS S 5/2-715, and courts include lost profits as a type of consequential damage. *See, e.g.*, *Cont'l Sand & Gravel, Inc. v. K &K Sand & Gravel, Inc.*, 755 F.2d 87, 92 (7th Cir. 1985). Furthermore, courts within the Seventh Circuit consistently hold that "lost profits must be proven with reasonable certainty. While exact precision is not required, it is the plaintiff's burden to prove lost profits by evidence that provides a reasonable basis for assessing damages." *Id.* (internal citations omitted); *Kiswani v. Phoenix Sec. Agency, Inc.*, 247 F.R.D. 554, 558 (N.D. Ill. 2008); *see also Euroholdings Capital &Inv. Corp. v. Harris Trust & Sav. Bank*, 602 F. Supp. 2d 928, 940 (N.D. Ill. 2009). "Reasonable certainty" means a "reasonable degree of persuasiveness." *TAS Distrib. Co. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 632 (7th Cir. 2007)(citation omitted). Although courts realize that lost profits are inherently prospective and, therefore, will be uncertain, the evidence must demonstrate "a reasonable basis

8

for the computation of damages." *Id.*

In this case we find that the Analysis does not provide a competent basis for determining Rush's lost cost savings with reasonable certainty and 3M's motion in limine must be granted. First, the Analysis is based on data from the LDS hospital, not from Rush. Additionally, the data is from a study performed by LDS in the early 1990s , whereas the time period for Rush's use of the Alerts would have been more than ten years later. Several factors, such as improvements in medicine and improvements in other technology used by Rush prior to Care Innovation, could cause there to be great discrepancies between the savings during the two time periods. Third, the analysis performed by LDS was for a system called HELP, a precursor to Care Innovation, but not the Care Innovation system itself. Finally, the LDS data was not adjusted for many real differences between Rush and LDS. The Analysis used publicly available data to adjust the LDS data to account for the difference in case mix, patient days, and discharges between the two hospitals. However, the Analysis did not take into account any other distinctions between the two hospitals, such as the actual number of adverse drug events at Rush per year, the types of adverse drug events, the costs associated with adverse drug events at Rush, and the differences in how such events were handled at Rush as opposed to LDS. Because the only support for the lost cost savings figure set forth by Rush is an analysis that uses decade-old data from a different hospital that used a different system and failed to account for many of the differences between LDS and Rush, this court cannot allow such a damages claim to proceed. *See TAS Distrib. Co.*, 491 F.3d at 636 (holding that plaintiff's claims for lost profits could not be calculated with reasonable certainty because it was based on the figures of a different company and plaintiff had failed to present evidence as to how its figures should be similar to those of the other company.);

*Midland Hotel Corp. v. Reuben H. Donnelly Corp.*, 118 Ill.2d 306, 317-18, 515 N.E.2d 61, 66-67 (Ill. 1987) (finding that plaintiff's lost profits evidence based on another company's performance was impermissible because it did not account for factors that may have led other company to outperform plaintiff and plaintiff had failed to isolate lost profits from other factors).

Second, 3M also claims that the Analysis should be barred because federal courts have consistently held that lost profits evidence is competent only if prepared by either an expert or a layperson with intimate knowledge of the business. Accordingly, 3M claims that, because a non-expert 3M employee without intimate knowledge of Rush's business and operations, prepared the Analysis, it is inadmissable on that grounds. Although 3M's argument somewhat overstates the rule, courts generally note that a layperson's analysis of lost profits may be reliable if prepared by someone with intimate knowledge of the business. *Donlin v. Philips Lighting N. Am. Corp.*, 564 F.3d 207, 215 (3d Cir. 2009); *Von Der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 862-63 (7th Cir. 2009); *Compania Administradora v. Titan Int'l, Inc.*, 533 F.3d 555, 560 (7th Cir. 2008). Therefore, the fact that this Analysis was not prepared by someone with that knowledge is a factor that weighs in favor of the evidence not being admitted, and is further evidence of the uncertainty of using the Analysis as a basis for Rush's savings in this case.

Third, 3M asserts that the Analysis could have been included in the agreement between the parties, but was not. Therefore, 3M claims that because the agreement was fully integrated, the lost cost savings claim is barred. We agree. The contract was formed between two sophisticated parties and the Analysis was prepared and given to Rush years before the parties entered into the agreement regarding the purchase of Care Innovation. Therefore, the parties could have included the Analysis in the agreement if desired. Rush could have insisted that 3M

guarantee the cost savings projected in the Analysis as part of the agreement. However, Rush did not do so. Furthermore, we have no doubt that 3M would not have guaranteed such savings as part of the agreement at the time it was signed. Therefore, we are not inclined to hold 3M to such a "guarantee" now, especially given the uncertainty regarding the lost cost savings figure.

Finally, 3M also raises the issue that many of the costs savings associated with the Alerts are systemic costs that actually would not have been saved by Rush, but by the patients themselves or the insurance carriers. Rush fails to address why this argument or to address why this would not be the case. Although we have no evidence before us regarding the amount of costs that would have been saved by patients and insurance carriers, as opposed to Rush, it is logical to conclude that *some* portion of the costs are borne by those parties and, thus, would have been saved by them, as opposed to Rush. Accordingly, an award to Rush of $22 million for lost cost savings would result in somewhat of a windfall to Rush.

### B. *Testimony of Robert M. Hess*

As part of its motion in limine, 3M also seeks to bar the testimony of Rush's expert Robert M. Hess. Hess used the Analysis provided by 3M and performed some calculations to account for inflation and the length of the contract term in order to calculate a concrete lost cost savings figure as to Rush. We need not discuss all of the arguments with regards to Hess's testimony, most of which are duplicative of the arguments regarding the Analysis itself. Rather, because we have found that Rush is barred from presenting evidence regarding lost cost savings, and specifically precluded from introducing the Analysis, Hess's testimony regarding lost cost savings must also be barred. It is undisputed that Hess's report is based almost entirely on the Analysis and, therefore, without it there is no foundation for his testimony. Therefore, Rush is

11

also precluded from presenting Hess's testimony regarding lost cost savings.

Accordingly, 3M's motion in limine to preclude Rush from claiming lost cost savings in the amount of approximately $22 million is granted in its entirety.

III. **Summary of Previous Rulings on the Remaining Motions in limine**

   A. *Rush's Motion in limine Seeking to Bar Evidence/Argument that Rush's Damages Should be Offset by the Purported Value to Rush of Care Innovation*

In this motion in limine Rush seeks to bar 3M from presenting argument and evidence that any damages that Rush suffered should be reduced by the "value" to Rush of the components of the Care Innovation system that worked and were used by Rush, and from asking the jury to place an arbitrary value on those parts.

At the pre-trial conference we found that granting this motion in limine does not preclude 3M from making the argument that, because some of the components of Care Innovation worked, it was entirely unreasonable for Rush to replace the entire system. However, we also found that, if the jury finds in favor of Rush and finds that Rush was reasonable in replacing the entire system, that figure should not be discounted by any purported value of various components of Care Innovation because: a) there is no way of calculating a reasonably certain value for those parts; and 2) if the jury finds that it was reasonable for Rush to replace the entire system, then the working parts of Care Innovation had no true "value" to Rush because Rush still had to incur the cost to replace the entire system.

Accordingly, for these reasons and the reasons stated at the pre-trial conference, Rush's motion in limine seeking to bar argument regarding an offset for the purported value of the working components of the system is granted.

B.  *Rush's Motion in limine Seeking to Bar Argument Based on Rush's Renewals of the Contract and Continued Use of Care Innovation*

Rush also filed a motion in limine that seeks to bar 3M from any argument based upon the fact that Rush renewed the contract for Care Innovation, continued to use the Care Innovation system, and made payments to 3M for support services for Care Innovation even after it filed this lawsuit. Rush contends that this type of argument should be barred because 3M will try and spin these facts into an argument that, because Rush continued to use and pay for the system, it must have been happy with Care Innovation. Rush claims that this type of argument will confuse the jury because, in fact, Rush only continued to use and pay for the system because it knew it would take years of a negotiation with a new vendor in order to get a new system put in place and there is undisputed evidence that Rush was actually unhappy with the system prior to 2003.

However, we denied this motion at the pre-trial conference on the grounds that 3M's introduction of the above facts and argument related to Rush's continued use of the system, and Rush's response to that argument, will not confuse the jury. Rather, they will be arguments that a jury will be able to understand. It will then be up to the jury to determine which argument it believes.

Accordingly, for the reasons set forth at the pre-trial conference, this motion is denied.

C.  *3M's Motion in limine Seeking to Bar Evidence Regarding Other Lawsuits or Complaints About the Care Innovation System*

3M's other motion in limine seeks to bar Rush from presenting evidence regarding other lawsuits or complaints by other 3M customers about the Care Innovation system. 3M argues that

13

these other complaints are not relevant to whether or not 3M performed its obligations under *this* agreement and such evidence will greatly lengthen the trial because 3M will then need to explain the details of those lawsuits or complaints, and present defenses to them as well.

At the pre-trial conference we agreed with Rush's argument that it took into account the fact that there was organized discontent with the product when it took the step to replace the product and that, therefore, these other complaints go to the reasonableness of Rush's decision to purchase a replacement system. Accordingly, we denied the motion as a whole. However, we also agreed with 3M's argument that it would unreasonably lengthen the trial if 3M had to defend all of the other complaints and lawsuits. Therefore, we directed Rush to bring any specific evidence regarding other user's complaints about Care Innovation to the attention of 3M and the court prior to trial and a decision will be made regarding these complaints on a case-by-case basis.

## IV.     3M's Motion for Discovery Sanctions

As a final matter, on September 9, 2009, 3M filed a motion for discovery sanctions. Specifically, 3M seeks to exclude the new damages evidence produced by Rush in which Rush seeks to increase its replacement cost damages from approximately $9.5 million to approximately $14.7 million. In support of its motion 3M alleges that fact discovery closed on August 15, 2006, expert discovery closed on February 19, 2007, and at no time over the past two years has Rush indicated that it intended to change its damages analysis. 3M further alleges that the first time it was made aware of Rush's intention to change its damages analysis was in the spring of 2009, and it was not until August 28, 2009 that 3M learned that the replacement cost amount had increased by over $5 million. Further, 3M states that the spreadsheet produced by

3M with the new replacement cost figure indicates that payments were being made for the replacement system from 2005 onward, but Rush failed to produce discovery regarding those payments during that time, as required by Federal Rule of Civil Procedure 26(e)(1). Finally, 3M asserts that it will be severely prejudiced by Rush's delay because it will have an extremely short period to review the new documents, depose new witnesses, and seek third party discovery of the vendors who have been paid by Rush prior to the scheduled November 9, 2009 trial date.

Rush asserts that 3M's motion should be denied because the $9.5 million figure it provided to 3M in 2006 was a projected estimate of what the replacement cost damages would be. Further, Rush claims that 3M knew the original figure was an estimate, knew that the installation of the new system was ongoing, and that it was explicitly understood between the parties that Rush would provide 3M with a new figure as trial approached and the new system's installation was complete. Rush asserts that 3M never objected to Rush's plan to supplement the replacement cost figure and discovery related to the new figure at a later date or demanded updated numbers throughout the installation of the new system. Rush states that if 3M had objected, Rush would have taken the issue up with the court on a previous occasion.

In support of its arguments, Rush cites to several depositions in which the deponents state that the original replacement cost figure was an estimate. Specifically, at the deposition of Rush's Associate Chief Information Officer, James Kearns, on May 5, 2006, he stated that the replacement cost figures were estimates and he "can't speak to what the actual costs will be." Further, he indicated that the costs could change over time as the new system continues to be implemented. (Rush's Resp. at 4-5.) Additionally, the report of 3M's own damages expert, R. Bruce Den Uyl, confirms that the original figure was an estimate and subject to revision. (*Id.* at

15

5.)

Rush also claims that it could not have known an exact replacement cost figure prior to completion of the installation, which was did not occur until June 2009. Further, Rush states that computation of an exact damages figure was made even more difficult because Rush is not seeking the entire cost of the replacement system, but only those elements of that cost which were reasonably necessary in order to provide the same functionalities that it could have expected from 3M. Therefore, Rush claims that as soon as the new system was installed in June 2009, analysts at Rush began working on a definitive analysis of actual replacement costs, which was provided to 3M on August 28, 2009. On that date Rush alleges that it also told 3M that the underlying data was available for inspection and made clear that the appropriate personnel were immediately available for deposition.

We find that the depositions and reports cited by Rush demonstrate that the original $9.5 million damages figure was an estimate. Furthermore, 3M clearly knew that installation of the replacement system was ongoing, and as 3M is in the business of installing these types of systems itself, it would have known that installation of such a system is an involved process that involves fluctuating and accruing costs.

Accordingly, we find that the jury should be able to evaluate all of the evidence and determine what it believes a fair and reasonable damages figure should be and deny 3M's motion for discovery sanctions. 3M is, however, granted leave to conduct discovery immediately with respect to the issue of damages.

**CONCLUSION**

For the foregoing reasons, Rush's motion [115] in limine to bar defendant from using opinion evidence relating to Rush's alleged "contributory deficiencies" and financial condition is denied in part and granted in part and 3M's motion [117] in limine to exclude Rush's "lost cost savings" evidence and bar the testimony of Robert M. Hess is granted. Additionally, as stated in the pre-trial conference held in chambers on June 26, 2009: 1) Rush's motion [113] in limine to exclude evidence and/or argument to offset Rush's damages by the purported value to Rush of the Care Innovation System is granted; 2) Rush's motion [114] in limine to bar 3M from argument based on Rush's renewals of the System Purchase Agreement and continued use of the Care Innovation System is denied; 3) 3M's motion [116] in limine to exclude evidence or reference to other lawsuits or complaints about the Care Innovation system is denied as a whole, however, Rush should bring any specific evidence regarding other user's complaints to the court and 3M's attention sufficiently in advance of trial so that a decision regarding each specific complaint can be made on a case-by-case basis. Finally, 3M's motion for discovery sanctions [133] is denied.

It is so ordered.

_____
Wayne R. Andersen
United States District Judge

Dated: October 1, 2009